UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RELIANCE MEDIAWORKS (USA) INC.,

    Plaintiff,

v.                                                         Case No. 11-14486

GIARMARCO, MULLINS &
HORTON, P.C., et al.,

    Defendants.

                                             /

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Reliance Mediaworks (USA) Inc.—consistently referred to in this action by its old name, "Adlabs"—agreed to occupy and operate a movie theater for a company called Newburgh. Before it moved in, Adlabs, citing a "changed financial position," tried to cancel the deal. Newburgh sued Adlabs for breach of contract and won nearly $5 million in damages. Adlabs now sues its attorneys from the action against Newburgh for legal malpractice and breach of fiduciary duty. The attorneys, Giarmarco, Mullins & Horton, P.C., Dennis Rauss, and Scott Pugliese (together, "GMH"), move for summary judgment as to the malpractice. The matter is fully briefed, and no hearing is needed. *See* E.D. Mich. L.R. 7.1(f)(2). Because no upstanding lawyer could rescue Adlabs from the nearly $5 million liability that Adlabs created, the motion will be granted.

**I. BACKGROUND**

Newburgh / Six Mile Limited Partnership II ("Newburgh") rented theater space in

Livonia, Michigan, to American Multi-Cinema, Inc. ("AMC"), based on a lease set to expire in October, 2009.  Upon learning that AMC planned not to renew the lease, Newburgh began searching for a new tenant.  (Anderson Dep. 14-15, Dkt. 24 Ex. 1.)  On March 13, 2008, Adlabs committed to become that new tenant by signing a fifteen-year lease.  The lease required Newburgh to "use commercially reasonable efforts" to remove AMC from the theater before October, 2009, in order to accelerate Adlabs's arrival.  For each month in 2009 that AMC remained, the lease allowed Adlabs to pay fifty-percent rent for a month after moving in.  (Dkt. 24, Ex. 2 ¶ 3.)  Although Newburgh would thus suffer a monetary penalty for failing to provide the theater to Adlabs by January 1, 2009, nothing in the lease allowed Adlabs to back out if Newburgh provided the theater later.

> Newburgh and Adlabs confined their agreement to the terms of the written lease:
>
> *Entire Agreement.*  This Lease shall constitute the entire agreement [of the] parties hereto; all prior agreements between the parties, whether written or oral, are merged herein and shall be of no force and effect.  This Lease cannot be changed, modified or discharged but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

(*Id.* ¶ 23.)

In a February 3, 2009, letter citing no clause of the lease, Adlabs purported to invoke a "right to not move forward with the transaction."  (Dkt. # 24 Ex. 6.)  In a second, February 5 letter Adlabs's attorney explained that "[Adlabs's] financial position has changed and that makes the proposed lease not economically viable."  (*Id.* Ex. 7.)  "Since the proposed lease is for a future term," the second letter added, "[Adlabs] does not believe it has any obligation to perform[.]"  (*Id.*)

2

Meanwhile, Newburgh and AMC had been negotiating AMC's early exit for around four months. Shortly after Adlabs's attempt to recant, AMC agreed to leave the theater by March 31, 2009, in exchange for $500,000. (Dkt. # 24, Exs. 4, 9.) This deal would occur only if Adlabs withdrew its withdrawal. Writing to Adlabs's counsel, Newburgh's counsel stated:

> [N]egotiations for the Lease were concluded months ago, resulting in a fully executed contract binding both parties . . . . [Adlabs] was made aware that [AMC] has a lease that extends until October 2009, which was specifically why Adlabs could not be [promised a] January 2009 delivery, and why Adlabs knew it could not have a termination right for failure to deliver . . . . [Newburgh] was never able to guarant[ee] that [AMC] would leave before the end of its lease term, so a compromise [*i.e.*, the fifty-percent rent clause] was struck to address the eventuality of a later 2009 delivery.
> . . . .
> [Further,] you need to advise your client [] that contracts for "future terms" are always enforceable; otherwise, virtually every commercial lease . . . would be unenforceable.
> . . . .
> [Y]ou need to make your client understand that breaching the Lease will be far more costly for them than honoring it later this year.

(*Id.* Ex. 8.) This letter was accurate, astute, and prescient.

After Adlabs stayed its course, Newburgh cancelled AMC's early departure, sued Adlabs for breach, and began to look for a new tenant. (*See* Anderson Dep. 33, 45-47, 63-64, 73-74.) On July 16, 2009, Insight Management Consultants, LLC, entered a renewable "management agreement" to operate the theater after AMC left. (Dkt. #24 Ex. 10.) In October, 2009, and again in December, 2009, Adlabs asked Newburgh, as a proposed settlement of the breach action, to ditch Insight and accept the old lease (actually, a new lease with similar terms) with Adlabs. (*Id.* Exs. 15, 18.) Although Insight pays Newburgh less than half as much as Adlabs was to pay, Newburgh ignored the offers.

*Newburgh / Six Mile L.P. II v. Adlabs Films USA, Inc.*, 724 F.Supp.2d 740 (E.D. Mich. July 13, 2010) (Murphy, J.), held that Adlabs breached the lease and awarded Newburgh $4,870,243.71 in damages, an amount later increased by attorney's fees. The district court denied a motion for reconsideration, 2:09-cv-11067 (Dkt. # 162) (E.D. Mich. Nov. 2, 2010), and the Sixth Circuit affirmed, 10-2562, 2012 WL 1850645 (6th Cir. May 22, 2012).

## II. STANDARD

Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute of material fact exists if "a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must draw each reasonable inference in favor of the non-moving party. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## III. DISCUSSION

To recover for legal malpractice, Adlabs must prove that it would have won the lawsuit against Newburgh if not for GMH's negligent legal representation. *Manzo v. Petrella*, 683 N.W.2d 699, 703-04 (Mich. Ct. App. 2004). GMH's conduct is therefore irrelevant unless Adlabs establishes "a case within a case," that is, a strong case against Newburgh.

Adlabs proposes that it could have avoided liability if GMH had better argued (1) that Newburgh induced Adlabs into the lease by fraud, (2) that Newburgh failed to "use commercially reasonable efforts" to convince AMC to leave early, (3) that Newburgh failed to mitigate its damages after Adlabs's breach, or (4) that the district

4

court miscalculated damages. (In this order "the district court" will always mean the court in the underlying breach of contract action.)

The district court's thorough July 13, 2010, decision addresses these issues. In fact, a review of the decision nearly dictates the outcome of this action.

### A. The District Court's Decision

The July 13, 2010, decision denied a motion from Adlabs to amend its answer, granted a motion from Newburgh for summary judgment, awarded contract damages, and dismissed Adlabs's counterclaims.

The motion to amend asked to add an affirmative defense of failure to mitigate damages and a counterclaim for specific performance. In the present action Adlabs stresses that the district court denied the motion to amend as untimely; in the process, however, the district court addressed the motion's substance. Discussing the counterclaim, the district court noted that the new request for relief was dubious:

> Adlabs [has made a] 180 degree change in position with respect to the Lease—Adlabs has from the beginning of this action claimed that it was not obligated to perform according to the Lease, and now seeks the benefit of the obligation it previously denied.

*Newburgh*, 724 F.Supp.2d at 752. The district court proceeded to explain why both the defense and the counterclaim could not succeed:

> Specific performance is not a remedy as of right, but rests in the sound discretion of the court's exercise of its powers in equity. Once a lease has been terminated after a default, the defaulting party may not seek specific performance of the contract. This principle is even more forceful when it is the defaulting party who is responsible for the termination. In this case, it is clear that Adlabs terminated the Lease when it advised Newburgh in a letter that it was "exercising its right to not move forward with the transaction" and later refused to withdraw the letter . . . . Having unequivocally terminated the Lease and forced Newburgh to find a new tenant on short notice, it would be inequitable to allow Adlabs to enforce that Lease in order to avoid liability.

> Thus, Adlabs' counterclaim for specific performance is futile because it could not survive a motion to dismiss or a motion for summary judgment.
>
> The same is true of Adlabs' proposed failure to mitigate defense. Although Adlabs did not originally plead the defense, Newburgh nevertheless preemptively rebuts such a defense in its brief in support of summary judgment . . . . [T]he undisputed evidence [shows] that Newburgh sought a replacement tenant, and when it could not find one, engaged a management company to operate the theater that Adlabs agreed to run . . . . [G]iven the evidence produced so far regarding [Newburgh's] mitigation efforts, it is unlikely there is any undiscovered evidence that would demonstrate that Newburgh failed to mitigate its damages. Therefore, it would be futile for Adlabs to assert a failure to mitigate defense.

724 F.Supp.2d at 752-53 (citations omitted) (emphasis removed).

Turning to Newburgh's motion for summary judgment, the district court concluded that Adlabs had breached the unambiguous terms of the lease and, further, that the lease's "entire agreement" clause barred the introduction of parol evidence, except to show fraud. Adlabs wanted to invoke the fraud exception by arguing that Newburgh promised Adlabs it could terminate the lease if Newburgh failed to provide the theater by January 1, 2009. Adlabs now emphasizes the district court's statement that Adlabs "failed to allege fraud with any particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure." *Id.* at 755. But again, the district court also discussed the merits. About the failure to plead fraud properly the district court wrote, "*Putting aside* the fact that Adlabs has failed to allege fraud with any particularity . . . . the defense [of fraudulent inducement] *fails as a matter of law.*" *Id.* at 755 (emphasis added). The district court lucidly elaborated:

> When a contract contains a merger clause releasing all antecedent claims, only a certain type of fraud can vitiate the contract: fraud that invalidates the merger clause itself, *i.e.*, fraud relating to the merger clause or fraud that vitiates the entire contract, including any merger clause. Thus, fraud that

6

> relates solely to an oral agreement later nullified by a valid merger clause does not render the contract voidable.
>
> The only allegation of fraud made by Adlabs is that Newburgh assured it, prior to signing the Lease, that it could terminate the Lease if it were not given possession by January 1, 2009. This alleged fraud relates solely to an oral agreement that was nullified by the merger and has no effect on the agreement, provided the merger clause is valid. To succeed on its fraud claim, therefore, Adlabs must show that the merger clause is invalid due to fraud . . . .
>
> [But] Adlabs' only allegation of fraud relates solely to an oral agreement regarding a commencement date of January 1, 2009 that was nullified by the merger clause in the Lease, which is insufficient to nullify [the merger clause or] the contract. Therefore, Adlabs' defense of fraud fails as a matter of law.

724 F.Supp.2d at 755-56 (citations omitted). Later the district court noted also that Adlabs's signing a lease with an "entire agreement" clause rendered any reliance on an oral statement unreasonable. *Id.* at 759.

Adlabs argued that Newburgh breached the lease by making less than a "commercially reasonable effort" to push AMC from the theater. The district court rejected this argument, because the evidence showed that Newburgh began timely negotiations with AMC and completed an early termination agreement. 724 F.Supp.2d at 758. Adlabs raised other theories as to how Newburgh breached the lease; in answer the district court said that the only breach occurred when "Adlabs backed out of its obligations by terminating." *Id.* at 758.

The only issue remaining was damages. Adlabs notes that GMH, its counsel, raised no challenge to Newburgh's damages calculation. GMH's silence, however, did not keep the district court from undertaking a reasonable damages analysis. The district court took the real estate tax and the rent Adlabs had agreed to pay each year under the fifteen-year lease, subtracted the amount Insight would pay each year

7

(assuming Newburgh and Insight renewed their contract for fifteen years), and then with an interest calculation reduced the amount for each year to present value. From that total the district court subtracted the $500,000 early-termination fee that Newburgh would have paid AMC if Adlabs had not breached, which left the final sum, $4,870.243.71. 724 F.Supp.2d at 757-58.

## B. Adlabs's Arguments

According to Adlabs, the district court "identified multiple miscues by [GMH]." Adlabs provides the following list (although, to be clear, several of these alleged "miscues" were not "identified" by the district court):

- Failure to plead fraud with the requisite particularity, resulting in summary judgment against Adlabs;

- Failure to develop or present evidence sufficient to establish [a] jury-submissible case of fraud in the inducement;

- Failure to plead the affirmative defense of failure to mitigate damages in the first responsive pleading, resulting in the forfeiture of that defense;

- Failure to present, in a timely fashion, the argument that Newburgh failed to mitigate its damages by rejecting Adlabs's offer to fulfill the lease;

- Failure to seek amendment of the scheduling order or the pleadings in a timely fashion, resulting in the permanent inability to seek specific performance (the very relief sought by Newburgh) and permanent inability to assert failure to mitigate;

- Failure to seek specific performance or agree to Newburgh's request for that relief in the first responsive pleading, resulting in forfeiture of the ability to enforce the lease;

- Failure to submit in a timely fashion the documents [*i.e.*, the October and December, 2009, settlement offers] presented with its Motion for Reconsideration, resulting in the Court striking that evidence;

8

- Failure to present evidence to establish that Newburgh did not use commercially reasonable efforts to secure an early termination of the AMC lease;

- Failure to present a post-argument submission on damages, or to respond to the post-argument submission of Newburgh;

- Failure to develop or present evidence regarding the rental value of the property, failure to argue that measure of damages, and failure to challenge Newburgh's inability to show the rental value.

(Pl.'s Resp. 1, Dkt. # 26.) The list states each of GMH's possible mistakes instead of only GMH's *consequential* mistakes. The result is bloated, redundant, and unhelpful. While cramming in criticism of GMH and re-litigating what the district court discussed, the list obscures which, if any, of the "miscues" possibly changed the outcome of the case.

Close study of the record reveals that the important issues—the ones that could have affected the outcome of the case—are the four merits issues identified earlier: fraud, "commercially reasonable effort," mitigation of damages, and the district court's damages calculation.

### 1. Fraud

Contrary to Adlabs's assertion, GMH's "failure to plead fraud with the requisite particularity" did not "result" in "summary judgment against Adlabs." Despite the lack of particularity, the district court addressed and rejected Adlabs's fraud argument. In any event, now Adlabs fails to plead fraud with particularity. In response to an interrogatory from GMH asking how GMH should have pleaded the alleged fraud, Adlabs states that Newburgh told Adlabs it could terminate the lease if it was not in the theater by January 1, 2009, and states that a representative of Newburgh told Adlabs's lawyer (a

different lawyer from GMH) to write the letters terminating the lease. (*See* Dkt. # 24 Ex. 24 at 4, 10-11.) These statements include no details. When was Adlabs told these things? Where? Who was present? What specifically was said? Adlabs should know these details from experience; they are conspicuously absent. If a plaintiff could proceed with a fraud action without stating concrete facts, alleging fraud to escape an unwanted contract would be too easy. *See* 5A Wright & Miller, *Federal Practice & Procedure* § 1296 (3d ed.).

Pleading aside, Adlabs's allegations of fraud either fail to answer the district court or make no sense. The district court assumed Adlabs was told it could terminate the lease unless it was in the theater by January 1, 2009. The problem was that Adlabs later signed a lease with a merger clause cancelling all oral agreements. Adlabs claims that either "(1) [Newburgh] induced Adlabs to believe the oral agreement regarding the January 1, 2009 due date was included in the lease when it was not; or (2) Newburgh caused Adlabs to forget the prior oral agreement and execute an incomplete lease[.]" (Dkt. # 24 Ex. 24 at 4.) Again, Adlabs provides no details. Without details, these claims look irredeemably odd. Adlabs never explains why it, a sophisticated business, failed to read and understand the lease. Was it given the wrong lease to read? How was it compelled to "forget" the terms of the agreement? Why does it not know whether it signed a lease it thought had a termination clause or it instead "forgot" to add a termination clause? Which was it and how did it happen? Odder still is the claim that Newburgh instructed Adlabs's lawyer to write the termination. Newburgh's counsel wrote Adlabs's counsel a February 13, 2009, letter berating Adlabs and demanding a withdrawal of the termination. If Adlabs terminated on Newburgh's command, why does

the termination never say so?  Where is Adlabs's incredulous and outraged response to Newburgh's February 13 letter?  What was Adlabs's lawyer doing?

Adlabs fails to show fraud and fails to approach showing fraud.

### 2.  "Commercially Reasonable Efforts"

For each month in 2009 that AMC remained in the theater Newburgh would halve Adlabs's rent for a month.  Newburgh had a good reason to push for AMC to leave early.  After months of negotiating, and just more than a month into 2009, Newburgh agreed to pay AMC $500,000 to leave.  The district court noted:

> A representative of Adlabs stated in her deposition that Adlabs is aware of no factual basis for claiming that Newburgh did not use commercially reasonable efforts to obtain an early termination, other than the simple fact that they did not have possession by January 1, 2009.

724 F.Supp.2d at 747.  In this action Adlabs asserts, without citation, that "Newburgh did not want to pay the $500,000 early termination fee." (Pl.'s Resp. 14.)  Adlabs neither explains this assertion nor explains what Newburgh should have done differently when dealing with AMC.  The record contains no evidence by which a jury could reasonably conclude that Newburgh acted unreasonably.

### 3.  Mitigation

Adlabs claims that Newburgh engaged in a "ploy" by which it "was able to saddle Adlabs with a liability exceeding $5,000,000 [counting attorney's fees] while retaining the ability to later lease out the premises, perhaps for a higher rent" than Adlabs was to pay.  (Pl.'s Resp. 13.)  Adlabs never establishes the plausibility, or even the rationality, of such a "ploy."  Such a scheme would make Newburgh money only if Insight paid artificially low rent, the plan remained hidden, and Newburgh won the action against

Adlabs. If Newburgh lost the action, as Adlabs continues to argue it should have, Newburgh would lose both attorney's fees and the rent discount enjoyed by Insight. No evidence or rational inference suggests Newburgh wanted to accept this risk rather than accept the safer money of a high-paying tenant. No evidence or inference shows a malign plan. The evidence shows only that "Newburgh sought a replacement tenant, and when it could not find one, engaged a management company[.]" *Newburgh*, 724 F.Supp.2d at 753; (*see* Anderson Dep. 33, 45-47, 63-64, 73-74.)

According to Adlabs, GMH needed to argue that "reasonable mitigation [] entail[ed] continuing to search for tenants—until an upturn in the economy if necessary—rather than . . . seeking to impose the shortfall on Adlabs." (Pl.'s Resp. 14.) This is a meritless argument. It is refuted merely by picturing the much better argument Adlabs would raise if Newburgh had said it was leaving the theater vacant until "an upturn in the economy." Newburgh found a new tenant promptly, precisely as it should have.

Adlabs contends that GMH should have procured specific performance of the lease. But, "once a lease has been terminated after a default," the district court said, "the defaulting party may not seek specific performance of the contract." 724 F.Supp.2d at 752 (citing *MacGlashan v. Harper*, 1 N.W.2d 30 (Mich. 1941); *Gurunian v. Grossman*, 49 N.W.2d 354 (Mich. 1951)). Because Adlabs breached and forced Newburgh to find a new tenant, the court continued, "it would be inequitable to allow Adlabs to enforce th[e] Lease in order to avoid liability." *Id.* Adlabs asserts a right to specific performance without acknowledging these rulings by the district court. Instead Adlabs tries to

12

circumvent the district court's decision by asserting that Newburgh's rejection of Adlabs's offers to perform amounted to a failure to mitigate damages.

Adlabs's attempt to distinguish the district court's decision never challenges the district court's reasoning. Adlabs attempts to shift the fault for the lease's collapse to Newburgh. But all Newburgh did was fail to renege on Insight in favor of committing to a by-then hostile relationship with an untrustworthy party of uncertain means. Specific performance has rarely required even a defendant to embrace such burdens. *See* Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 462 (1897); *cf. Laker v. Soverinsky*, 27 N.W.2d 600, 601 (Mich. 1947) (barring specific performance of a lease likely to cause further litigation). By its own acts Adlabs lost the right to demand specific performance as a counterclaim, as required mitigation of damages, or as anything else. The demand is unreasonable in any form.

A point on the list of GMH's supposed "miscues" states that GMH should have "agree[d] to Newburgh's request for [specific performance] in the first responsive pleading." Indeed, Newburgh's complaint requested specific performance. In the rest of its brief, however, Adlabs never mentions this argument again. Lacking any development, the argument is waived. *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999). In any case, presumably GMH could not accept specific performance without Adlabs's consent, and no record evidence establishes when Adlabs would have first accepted specific performance.

Adlabs insists that during the litigation against Newburgh GMH needed to submit evidence of Newburgh's failure to mitigate damages and of Adlabs's right to specific

performance. Adlabs cannot fault GMH for failing to do then what Adlabs fails to do now.

### 4. Damages

The district court calculated damages competently and reasonably. The calculation was based on a statement in *Tel-Ex Plaza, Inc. v. Hardees Restaurants, Inc.*, 255 N.W.2d 794 (Mich. Ct. App. 1977), that "where an agreement to lease is breached by the prospective lessee" the lessor may receive "the excess of the agreed rent over . . . the rent plaintiff could obtain for the property through reasonable diligence," *id.* at 796. The district court concluded that the money Newburgh would collect from Insight constituted "the rent plaintiff could obtain . . . through reasonable diligence." The court calculated accordingly.

No challenge to *Tel-Ex*, no challenge to the district court's calculation, and no other sustained analysis on damages appears. Rather, Adlabs offers a few quotes, first from *Leo v. Pearce Stores Co.*, 57 F.2d 340 (E.D. Mich. 1932). Although in its brief Adlabs writes "(Mich., 1932)," *Leo* is in fact a federal case that cites no pertinent Michigan case. Hence *Leo* is not a governing authority. Adlabs next quotes *Fera v. Village Plaza, Inc.*, 242 N.W.2d 372 (Mich. 1976), which, quoting *Jarrait v. Peters*, 108 N.W. 432 (Mich. 1906), states, "[T]he measure of damages when a lessor fails to give possession of the leased premises is the difference between the actual rental value and the rent reserved," *id* at 642. This quote is not germane. It discusses a landlord's breach, and it arises in a case about whether a new tenant can recover lost profits. Moreover, Adlabs omits what *Fera* says later:

> The rule [expressed by *Jarrait* and other cases] is merely an application of the doctrine that "in order to be entitled to a verdict, or a judgment, for damages for breach of contract, the plaintiff must lay a basis for a reasonable estimate of the extent of his harm, measured in money." 5 Corbin on Contracts, s 1020, p. 124.

*Fera*, 242 N.W.2d at 373-74. As *Fera* confirms, a good analysis of damages explains why a damages calculation is or is not sensible. Adlabs's quotes fail to address what matters.

Finally, Adlabs quotes paragraph 20(c) of the lease, which states in part:

> Should Landlord at any time terminate this Lease for any breach, *in addition to any other remedies it may have*, it may recover from Tenant *all damages it may incur* by reason of such breach, . . *including* . . . the excess, if any, of the amount of rent and charges equivalent to the rent reserved in this Lease for the remainder of the stated term over the then reasonable rental value of the Leased Premises for the remainder of the stated term[.]

(Dkt. # 24 Ex. 2 at 16 (emphasis added).) Adlabs observes that this clause says "reasonable rental value," but Adlabs omits the italicized terms. Adlabs omits also a line in paragraph 20(a) stating that Newburgh may receive the remedies in paragraph 20(c) "in addition to its other remedies provided by law." (*Id.* at 15.) Nonetheless, Adlabs proposes that GMH's reading of paragraph 20 is "simply wrong" and that GMH probably "failed to read the Lease carefully." Adlabs's words are aptly applied, it seems, to Adlabs today.

The damages calculation remains persuasive.

### 5. Breach of Fiduciary Duty

Adlabs asserts a claim for breach of fiduciary duty that GMH never explicitly addresses. In its response brief Adlabs therefore writes, "While styled a Motion for Summary Judgment, [GMH's] Motion is better regarded as a motion for partial summary

judgment because it addresses only some of the liability theories." (Pl.'s Resp. 9 n.2.) "Some" apparently means "one of two"—legal malpractice but not breach of fiduciary duty. Although it never explicitly addresses each count, GMH addresses the substance of Adlabs's entire case and evidently intends to defeat it. The motion for summary judgment concludes: "GMH [] did not cause Adlabs to lose the Underlying Case . . . . GMH [is] entitled to summary judgment on the claims against [it], as a matter of law." (Def.'s Mot. For Summ. J. 10, Dkt. # 24.) This passage displays an understanding that, without an injury proximately caused by GMH, Adlabs's claims, plural, fail. *See Alpha Capital Mngmt., Inc. v. Rentenbach*, 792 N.W.2d 344, 368-69 (Mich. Ct. App. 2010); 37 C.J.S. Fraud § 15 (2012) ("A claim alleging a breach of fiduciary duty sounds in tort and damages is a necessary element[.]"); *see also In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002) (Easterbrook, J.) ("No injury, no tort, is an ingredient of every state's law.").

The absence of focused briefing compels hesitation, however. Each party should address whether Adlabs's inability to prove the "case within a case" dooms the claim for breach of fiduciary duty.

### 6. Discovery

Adlabs claims that GMH's motion for summary judgment is premature because discovery is not over. Consideration of the motion may proceed, however, unless Adlabs "details the discovery needed." *Abercrombie & Fitch, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002); *see also* Fed. R. Civ. P. 56(d) (requiring the non-moving party to provide "specified reasons" why "it cannot present facts essential to justify its opposition" to summary judgment).

In its response to the motion for summary judgment and in a motion to extend discovery, Adlabs offers only general proclamations that more discovery will reveal evidence of fraud or of a failure to mitigate damages. These assertions are insufficient. Further, Adlabs's vague allegations of fraud and of a "ploy" to increase damages leave no reason to expect that more discovery will uncover pertinent evidence. *See also Newburgh*, 724 F.Supp.2d at 753 ("[I]t is unlikely there is any undiscovered evidence that would demonstrate that Newburgh failed to mitigate its damages.").

Adlabs presents no good reason to delay adjudicating GMH's motion for summary judgment. The motion to extend discovery is abated pending further briefing on Adlabs's claim for breach of fiduciary duty.

### IV. CONCLUSION

IT IS ORDERED that GMH's motion for summary judgment [Dkt. # 24] is GRANTED, and summary judgment will be granted on the legal malpractice claim.

IT IS FURTHER ORDERED that by **December 3, 2012**, GMH shall submit a paper of no more than ten pages addressing the claim for breach of fiduciary duty. Adlabs may respond in a paper of no more than ten pages by **December 17, 2012**.

    s/Robert H. Cleland
    ROBERT H. CLELAND
    UNITED STATES DISTRICT JUDGE

Dated: November 27, 2012

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 27, 2012, by electronic and/or ordinary mail.

                                         s/Lisa Wagner
                                         Case Manager and Deputy Clerk
                                         (313) 234-5522